UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| LARRY REED, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 4:05CV1072 TIA ) |
| JO ANNE B. BARNHART, COMMISSIONER OF SOCIAL SECURITY, | ) ) ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the denial of Plaintiff's applications for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act. The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

## Procedural History

On May 17, 2002, Plaintiff filed applications for Supplemental Security Income Benefits (SSI) and Disability Insurance Benefits (DIB), alleging disability beginning November 1, 2000. (Tr.39-41; 161-163) Both applications were denied. (Tr. 28-33; 164-168) On February 3, 2004, Plaintiff testified at a hearing before an Administrative Law Judge (ALJ). (Tr. 182-213) In a decision dated March 26, 2004, the ALJ determined that plaintiff was not disabled and was not entitled to a period of disability, Disability Insurance Benefits, or Supplemental Security Income. (Tr. 16-21) On October 26, 2004, the Appeals Council denied plaintiff's request for review. (Tr. 5-7) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff was represented by counsel. Plaintiff's birthday was December 30, 1954, and he was 49 years old at the time of the hearing. He completed the 11th grade and did not have a GED or other high school equivalency certificate. Plaintiff did not receive any special education or extra help with reading or writing in school. Plaintiff stated that he could read and write a note. He lived in an apartment in St. Louis, Missouri, with his brother and his brother's three grandchildren, ages 4, 11, and 12. His brother received disability benefits from the service, and he suffered from mental problems. (Tr. 190-191; 199-201; 206)

Plaintiff testified that Dr. Patel had been his treating physician. Plaintiff saw Dr. Patel about three or four times. Plaintiff further testified that he had previous convictions stealing and a UUW. He served an 18 month sentence for the stealing conviction. He stated that he did not do any recreational drugs or take someone else's medication at the time of the hearing. Plaintiff took his medications as prescribed and followed his treatment as instructed. He received regular psychiatric care twice a month. (Tr. 192-194)

In 1996, Plaintiff worked for the City of St. Louis driving a eight-wheel truck. Plaintiff also packed boxes for Manpower on a temporary basis in 2002. Plaintiff kept that job for only a week or week and a half. He last looked for full-time employment in January, 2004. (Tr. 194-195)

Plaintiff testified that he last used street drugs when he was in treatment in January of 2002. He last used alcohol on New Year's Day, 2004, about a month before the hearing. He stated that he became a little tipsy and a little high, but not drunk. Prior to that time, Plaintiff reported that he consumed alcohol on Thanksgiving of 2003. In 2001, Plaintiff had a drug and alcohol habit. While he showed no earnings, he reported spending $1,100 on drugs and alcohol in the month of December.

2

Plaintiff testified that a friend paid him the money under the table for performing small construction side jobs. The work lasted for one or two months. Plaintiff stated that he did not earn the money selling drugs. (Tr. 195-198)

Plaintiff testified that he started having hallucinations after his release from prison in 2000. He heard voices about once a week, which told him things like somebody was after him, and he needed to leave. Plaintiff was able to take care of his own personal needs, as well as help care for the grandchildren one or two hours a day. Plaintiff had a valid driver's license but last drove in 1998. Plaintiff helped with chores around the house such as vacuuming once a week and sweeping. He did not do laundry; somebody else washed his clothes. Plaintiff did not shop, go to church, go out to eat, meet with friends or relatives outside his home, or belong to any social clubs or organizations. He testified that he left his house once or twice a week to walk around or sit in the park or recreational center. At the center, Plaintiff watched people play basketball. (Tr. 198-202)

Plaintiff stated that he believed his was disabled due to his state of mind, hallucinations, paranoia, and suicidal thoughts. He had thought about suicide once a week since his 2000 prison release. He also testified that he thought about killing someone else about once a month when he felt as though somebody distrusts him. Plaintiff tried to kill himself in May of 2003 by jumping out of a plate glass window. He stated that he also attempted suicide in June or July of 2002. According to Plaintiff, these were not the only two suicide attempts. Plaintiff stated that he did not get along with other people and tried to avoid them. He also had trouble falling asleep. Plaintiff opined that he could pay attention to one thing for a minute or two before becoming distracted. (Tr. 202-205)

Plaintiff further testified that he experienced headaches once a week. He had dizziness. blurred vision, and light sensitivity during his headache episodes. Plaintiff took aspirin for the pain,

3

which helped about half the time. Plaintiff told his doctors about the headaches. However, they had not given him any advice for stopping the pain. When the aspirin did not stop the headaches, they would last for hours. Plaintiff also stated that he was unable to operate his left arm because he had staples around his left elbow as a result of his suicide attempt through the glass. The doctors removed the staples over a year before the hearing. Plaintiff was able to use both hands to button his clothing and put on his pants. He bathed twice a week and changed his clothing about three times a week. He opined that he could lift and carry about 30 pounds. He was right handed. Plaintiff also stated that he still had staples in his right hip from the same incident. Reaching over his head or in front of him with his left arm caused pain in his elbow and shoulder. However, plaintiff had not seen a doctor for this pain in the past year. Plaintiff testified that Dr. Patel was no longer his treating physician because he went to another practice. (Tr. 206-211)

## Medical Evidence

On November 15, 2000, Plaintiff was admitted to the Metropolitan St. Louis Psychiatric Center with a history of drug abuse, which he had been using daily before his hospitalization. He was unemployed; however he had been using marijuana and crack cocaine, and he drank at least 2 to 6 beers a day. Prior to admission, Plaintiff became fearful that people were stalking him. He began seeing and hearing things. (Tr. 106)

Mental Status Examination revealed a glum and restricted affect. His speech was normal, and his motor examination revealed no tics or tremors. His flow of thought was logical and directed in response to questions. However, he seemed to focus on his paranoid themes. Plaintiff reported hearing voices and experiencing paranoid delusions that people were outside his home stalking him. He had no suicidal or homicidal ideation, although he also stated that he wanted to hunt down the

4

people and "give them what they deserve." Plaintiff was alert and oriented X3. His intelligence was average, and his memory was intact. Plaintiff's insight and judgment were limited. Drug testing was positive for cocaine. After hospitalization, Plaintiff's spirits were improved; he had no paranoid themes; his insight and judgment were improved; and sensorium was intact. Dr. Douglas McCoy, the attending psychiatrist, diagnosed Substance Induced Psychotic Disorder; Antisocial Personality Disorder; and a Global Assessment Functioning ("GAF") of 55. Dr. McCoy prescribed Risperdal and advised Plaintiff to follow-up with outpatient drug rehabilitation, vocational rehabilitation, and Risperdal maintenance. (Tr. 106-108)

Plaintiff referred himself for treatment on December 4, 2001, complaining that his mind was going and coming. Intake notes indicated that he had a long history of drug use which led to inappropriate and violent behavior and that he previously tried to commit suicide by running into traffic. Plaintiff exhibited poor eye contact; slurred speech; argumentative, irritable, and uncooperative behavior; coherent flow of thought; anxious mood; homicidal thoughts and antisocial attitudes; and paranoia with no specific delusions presented. The treating psychiatrist rated the severity of Plaintiff's illness as moderately ill. The diagnoses included polysubstance induced psychotic disorder and antisocial personality disorder. (Tr. 122-125)

On December 18, 2001, Plaintiff sought drug abuse treatment from Archway Communities. Plaintiff's treatment history included 3 prior treatments for substance abuse. However, he reported using more within the past 6 months. Over the past 30 days, Plaintiff had used alcohol, heroin, cocaine, and cannabis. He reported spending $100 on alcohol and $1,000 on drugs during that time period, and he stated that he had received $1,500 from illegal activities. Plaintiff's severity profile indicated that his most severe problems were with drugs and alcohol, followed by

5

employment/support and family/social problems. Plaintiff exhibited no psychiatric problems. He was discharged on January 15, 2002 in positive condition after completion of the program. (Tr. 126-146)

Plaintiff was hospitalized from May 1 to May 3, 2002, at St. Louis University Hospital after he jumped through double pane glass while running from the police. Follow-up treatment notes dated May 8, 2002, reflect that Plaintiff suffered multiple lacerations over his forehead, left thigh, left forearm, left ring finger, small finger, and right dorsal and volar wrists. He also complained of neck pain, for which he wore a C-collar. The multiple lacerations over the left forearm, left small finger, left ring finger and right wrist appeared well healed, and Dr. John D. Verghese removed the sutures. Dr. Verghese noted that Trauma Surgery would monitor Plaintiff's other injuries and that the team elected not to remove the staples over his left hip. Dr. Verghese also noted that the staples in Plaintiff's left hand and forearm would remain intact until his follow-up in one week. (Tr. 157-159) Plaintiff returned to SLUCare on May 14, 2002 for removal of his arm and hip staples. Plaintiff's injuries appeared well-healed. (Tr. 156)

On September 5, 2002, L. Lynn Mades, Ph.D., performed a psychological evaluation of Plaintiff, who complained of paranoia, suicidal thoughts, depression, trouble writing, and a violent temper. Dr. Mades noted that Plaintiff was vague when discussing his complaints and his drug and alcohol use. Plaintiff was casually dressed and well-groomed. Dr. Mades noted no deficits in motor functioning. He was spontaneous, coherent, relevant, and logical, with questionable to fair cooperation. In addition, Plaintiff's speech was normal; his mood was agitated; and his affect was restricted and generally appropriate. With regard to his content of thought, Plaintiff exhibited no preoccupations, thought disturbances, or perceptual distortions. He reported no delusions and denied any auditory or visual hallucinations. Plaintiff also denied any suicidal and homicidal ideation. Dr.

6

Mades noted that overall Plaintiff showed no evidence of thought disturbance. Plaintiff displayed some difficulties during his sensorium examination. His insight and judgment was limited. (Tr. 147-150)

Plaintiff reported that he lived with his mother, did some household chores, and did not drive. He spent his time sitting in the park, talking to his mother, and listening to the radio. He claimed to have no friends. He was able to take care of his personal needs. While he had the ability to maintain adequate attention and concentration, he showed decreased persistence and pace. Dr. Mades diagnosed alcohol abuse; cannabis abuse; cocaine abuse; opioid abuse; antisocial personality disorder; moderate psychosocial and environmental problems stemming from interpersonal and legal problems; and a GAF of 75. Dr. Mades noted that Plaintiff's complaints of suicide and paranoia were vague and inconsistent with the record. Dr. Mades observed that Plaintiff showed no evidence of any problems other than antisocial personality and substance abuse. Dr. Mades further stated that there was no evidence of a psychological impairment that would limit Plaintiff from engaging in sustained employment. Plaintiff appeared able to perform simple, manual tasks with limited interaction with other people. His prognosis was fair with abstinence from substance abuse but guarded with continued use. While Plaintiff understood the nature of the examination, he did not appear competent to manage funds due to his substance abuse. (Tr. 150-151)

On September 18, 2002, Dr. Rocco Cottone completed a mental residual functional capacity assessment and a psychiatric review technique form. Dr. Cottone assessed marked limitations in the ability to understand and remember detailed instructions; ability to carry out detailed instructions; and ability to interact appropriately with the general public. Plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods; ability to sustain an ordinary routine

7

without special supervision; ability to work in coordination with or proximity to others without being distracted by them; ability to accept instructions and respond appropriately to criticism from supervisors; ability to get along with co-workers; ability to be aware of normal hazards and take appropriate precautions; and ability to set realistic goals. Dr. Cottone concluded that Plaintiff must avoid work involving intense or extensive interpersonal interaction; close coordination or communication with other workers or supervisors; proximity to available controlled substances; and public contact by phone or in person. Dr. Cottone further noted that Plaintiff was able to understand, remember, carry out, and persist at simple tasks; make simple work-related judgments; relate adequately to co-workers and supervisors; and adjust adequately to ordinary changes in work routine and setting. (Tr. 88-90) On the Psychiatric Review Technique form, Dr. Cottone assessed personality disorders and substance addiction disorders. (Tr. 92-105)

Plaintiff was admitted to Archway Communities on December 19, 2002 and discharged in on January 15, 2003, after completion of the treatment program. Plaintiff's discharge plan included completing the MERS vocational application process/program and continuing treatment on an out-patient basis. (Tr. 126-127)

Dr. Parimal Patel examined Plaintiff on September 22, 2003. Plaintiff complained of feeling anxious, worried, helpless, and worthless. He reported auditory hallucinations and paranoid delusions. Dr. Patel diagnosed Psychosis, nos; Depression, nos; and a GAF of 45-50. Dr. Patel prescribed Zyprexa and Zoloft. (Tr. 153-154) Plaintiff saw Dr. Patel again on October 20, 2003. Plaintiff reported no hallucinations or suicidality, but he did describe paranoid delusions. Dr. Patel rated Plaintiff's insight as marginal and his judgment as guarded. (Tr. 155) A January 19, 2004 letter from Dr. Patel noted that he saw Plaintiff on September 22 and October 20 of 2003 and that his

8

diagnosis was Psychosis, nos and Depression, nos. (Tr. 152)

On January 19, 2004, Dr. Suren Chaganti evaluated Plaintiff. His mental status was unchanged from his previous exam. Dr. Chaganti continued Plaintiff's prescriptions for Zoloft and Zyprexa. (Tr. 179) Plaintiff saw Dr. Chaganti again on August 16, 2004. Plaintiff reported that he was not doing good. He expressed feelings of depression, and reported auditory hallucinations and paranoid delusions. His insight was poor, and his judgment was impaired. Dr. Chaganti prescribed Seroquel and Zoloft and advised Plaintiff to follow-up in two weeks. (Tr. 180) In a letter dated August 30, 2004, Dr. Chaganti noted that Plaintiff's diagnosis was schizoaffective disorder, depressed with paranoid. He listed Plaintiff's medications as Seroquel and Zoloft. (Tr. 173)

## The ALJ's Determination

In a decision dated March 26, 2004, the ALJ found that Plaintiff met the disability insured status requirements on November 1, 2000, the date he claimed he became unable to work, and continued to meet them through September 30, 2003. The ALJ determined that Plaintiff had severe psychosis secondary to polysubstance abuse and antisocial personality disorder but that he did not have an impairment or combination of impairments listed in or medically equal to one in Appendix 1, Subpart P, Regulations No. 4. The ALJ found Plaintiff's allegations that he was unable to engage in work activity not credible. Instead, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform work activity at all levels of exertion, provided that he abstained from polysubstance abuse. Plaintiff was 49 years old, which was defined as a younger individual, and he had a tenth grade education. The ALJ found that Plaintiff could perform his past work as either a truck driver or a refuse worker. Further, Plaintiff's drug and alcohol addiction were contributing factors material to the disability determination. The ALJ noted that the medical evidence established

9

that Plaintiff would not be disabled if he stopped using drugs and/or alcohol. In light of Plaintiff's ability to work at all levels of exertion, his age, education, and past work experience, the ALJ concluded that Plaintiff was not under a disability at any time through the date of the decision. (Tr. 20-21)

Specifically, the ALJ assessed Plaintiff's testimony, along with the medical evidence. The ALJ noted that Plaintiff's diagnoses were drug and alcohol related and that the evidence demonstrated that Plaintiff's mental impairments were exacerbated by drug and alcohol abuse. He further noted that Public Law 104-121, section 105, precluded a finding of disability based on drug and/or alcohol abuse or addiction. The ALJ observed that Plaintiff was able to successfully complete a one-month treatment program where he was without the influence of drugs and alcohol. (Tr. 17-19)

The ALJ noted Plaintiff's alleged headaches but found them to be non-severe based on the fact that he took only over-the-counter medication and denied any vomiting or nausea. Further, while Plaintiff was previously injured, there was no medical evidence that he had obtained any care for his arm and hip since 2002. The ALJ also noted Plaintiff's normal level of daily activity. He therefore found that Plaintiff did not have any severe physical impairment. Thus, the ALJ concluded that the overall evidence suggested that Plaintiff would not be disabled if he stopped using drugs and alcohol. He found that Plaintiff retained the RFC to perform work activity at all levels of exertion, which included his past relevant jobs as a truck driver or a refuse worker. Based on the above, the ALJ determined that Plaintiff was not disabled up to and through the date of the decision. (Tr. 19)

**Legal Standards**

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as

10

"the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a). To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that plaintiff is not engaged in substantial gainful activity; (2) that he has a severe impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities; or (3) he has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) he is unable to return to his past relevant work; and (5) his impairments prevent him from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robert v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional

11

activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak, 49 F.3d at 1354.

## Discussion

Plaintiff contends that the Commissioner's decision should be reversed because the ALJ failed to articulate what evidence supported the conclusion that drug abuse and alcoholism were material factors in the disability determination. As such, Plaintiff asserts that substantial evidence does not

12

support the ALJ's RFC finding in light of Singh and Lauer. Further, Plaintiff argues that the ALJ failed to properly consider Plaintiff's subjective complaints under Polaski. The Defendant maintains that the ALJ performed a proper drug and alcohol abuse analysis and properly evaluated Plaintiff's credibility. Thus, the Defendant requests that the Court affirm the Commissioner's decision.

The undersigned agrees with Plaintiff that the ALJ did not properly evaluate his substance abuse in the instant case. "[I]f alcohol or drug abuse comprises a contributing factor material to the determination of a disability, the claimant's application must be denied. . . . 20 C.F.R. § 404.1535." Brueggemann v. Barnhart, 348 F.3d 689, 693 (8th Cir. 2003). However, the ALJ must follow the correct procedures for making this determination which includes (1) evaluating whether the plaintiff would still be disabled if he stopped using drugs or alcohol and (2) evaluating which limitations would remain if plaintiff stopped using drugs or alcohol and determining whether the remaining limitations would be disabling. Id. at 693 n.2. This determination, requires that the ALJ base the "disability determination on substantial evidence of [plaintiff's] medical limitations without deductions for the assumed effects of substance abuse disorders. The inquiry here concerns strictly symptoms, not causes[.]" Id. at 694. The Plaintiff has the burden of proving that his substance abuse is not a contributing factor material to his alleged disability. Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002). "However, the ALJ retains the responsibility of developing a full and fair record in the non-adversarial administrative proceeding." Brueggemann, 348 F.3d at 693.

In the instant case, substantial evidence does not support the ALJ's determination that plaintiff did not have mental limitations "without deductions for the assumed effects of substance abuse disorders." Id. First, the ALJ found that plaintiff suffered from an antisocial personality disorder in

13

addition to severe psychosis secondary to polysubstance abuse.[1] However, the opinion reflects that he disregarded that finding and attributed all of Plaintiff's mental impairments to drug and alcohol abuse. The ALJ relied primarily on the opinion of Dr. Mades, who evaluated plaintiff only once on behalf of Disability Determinations. While the ALJ mentioned Plaintiff's former treating psychiatrist, Dr. Patel,[2] the ALJ dismissed the evidence of Dr. Patel's psychological evaluations which included a low GAF score[3] and prescriptions for anti-depressants and anti-psychotic drugs.[4] "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). However, the opinion must be well-supported and not inconsistent with other substantial evidence in the record. Id. To the contrary, the opinion of a consulting physician does not generally constitute substantial evidence. Id.

---

[1] A personality disorder is the "general term for a group of behavioral [disorders] characterized by usually lifelong, ingrained, maladaptive patterns of deviant behavior, life style, and social adjustment that are different in quality from psychotic and neurotic symptoms; former designations for individuals with these personality [disorders] were psychopath and sociopath." 509 Stedman's Medical Dictionary (26th ed. 1995).

[2] The medical evidence shows that Plaintiff later saw Dr. Patel's partner, Dr. Chaganti, whose treatment notes mirrored those of Dr. Patel. While the ALJ only had notes from one of the visits, there is no indication that the ALJ considered this evidence.

[3] Dr. Patel's GAF score for Plaintiff was 45-50, indicating "Serious symptoms . . . OR any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." DSM-IV-TR at 34.

[4] Zyprexa is "used to treat psychotic mental disorders, such as schizophrenia, bipolar disorder, and agitation that occurs with schizophrenia and bipolar mania." http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/203492.html. Zoloft is "used to treat mental depression, obsessive-compulsive disorder, panic disorder, premenstrual dysphoric disorder, posttraumatic stress disosrder, and social anxiety disorder." http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202651.html. Dr. Chaganti later prescribed Seroquel, which is "used to treat psychotic disorders, such as schizophrenia." http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/203124.html.

14

The record shows that Drs. Patel's and Chaganti's diagnoses were not inconsistent with other evidence in the record, and they were based on more than one visit with Plaintiff. Only Dr. Mades' report contradicted Dr. Patel's and Dr. Chaganti's assessments. Indeed, the ALJ noted that the 2002 mental residual functional capacity assessment by the state agency medical consultants set forth limitations which clearly prevented substantial gainful activity. (Tr. 18) While the ALJ found that the primary diagnoses were drug/alcohol related, he relied solely on earlier assessments made prior to a drug abuse treatment program, while disregarding more recent reports. The ALJ noted Dr. Patel's GAF score which confirmed Plaintiff's decreased mental functioning. It appears that the ALJ may have attributed this score to drugs and alcohol as well. However, the ALJ cites no evidence indicating that Dr. Patel based Plaintiff's diagnoses on drug and/or alcohol abuse.[5] The consistent diagnoses of a psychosis and depression, in conjunction with prescribing anti-psychotic and anti-depressant drugs may indicate that plaintiff's mental impairments could remain in the absence of alcoholism. See Brueggemann, 348 F.3d at 695 (ALJ may only consider contributing factor after making determination that substantial evidence on the record shows what limitations would remain without alcoholism). Review of the record indicates that the ALJ did not properly assess plaintiff's mental impairments in the absence of drug abuse and alcoholism. Therefore, the case should be remanded for further evaluation.

---

[5] While the diagnoses from Drs. Patel and Chaganti do not appear to reflect drug abuse and alcoholism as a material factor, the undersigned observes that the treatment notes are difficult to read at best. On remand, the ALJ may wish to further develop the record by seeking more legible assessments. The Eighth Circuit Court of Appeals has held that "social security hearings are non-adversarial. . . . Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case. . . . The ALJ's duty extends even to cases . . . where an attorney represented the claimant at the administrative hearing." Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004) (citations omitted).

In addition, the undersigned questions the ALJ's RFC finding and conclusion that Plaintiff could return to his past jobs as a truck driver or refuse worker.[6] It appears to the undersigned that Plaintiff's anti-social personality disorder may impact his ability to perform the full range of work-related activities. Indeed, given the fact that Plaintiff has limitations in interacting with others, the ALJ may want to further develop this finding. If the ALJ determines that Plaintiff cannot return to his past relevant work at step 4, he should then move to step 5 to determine whether there are other jobs in the national economy which Plaintiff could perform. Further, if the ALJ deems it proper to move to this step, he should also consider utilizing a vocational expert (VE). "[W]hen a claimant is limited by a nonexertional impairment, such as pain or mental incapacity, the Commissioner may not rely on the Guidelines and must instead present testimony from a vocational expert to support a determination of no disability." Holley v. Massanari, 253 F.3d 1088, 1093 (8th Cir. 2001) (citation omitted). Mental impairments are nonexertional impairments which can limit a plaintiff's ability to perform the full range of work in a particular category. Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

Therefore, the undersigned finds that this case should be remanded to the Commissioner for further proceedings to properly determine Plaintiff's limitations in the absence of drug abuse and alcoholism. In addition, if, on remand, the ALJ moves to step 5, he should consult a VE to ascertain the effect of plaintiff's mental impairments on his ability to work. Id. The undersigned does not express an opinion on whether or not plaintiff is disabled or entitled to benefits. The case should therefore be remanded to the Commissioner for further proceedings consistent with this opinion.

---

[6] The undersigned notes that Plaintiff testified that he had not driven a vehicle since 1998. (Tr. 201)

Accordingly,

**IT IS HEREBY ORDERED** that this cause be **REMANDED** to the Commissioner for further proceedings consistent with this Memorandum and Order.

                                        /s/ Terry I. Adelman
                               UNITED STATES MAGISTRATE JUDGE

Dated this 27th day of September, 2006.